IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KONG SOK,

                Plaintiff,            OPINION AND ORDER

v.

                                    20-cv-489-wmc

KILOLO KIJAKAZI, Acting Commissioner
For Social Security,

                Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Kong Sok seeks judicial review of a final determination that Sok was not disabled within the meaning of the Social Security Act. Plaintiff raises a single argument on appeal, contending that Administrative Law Judge ("ALJ") Janet Akers improperly based her denial of benefits on the vocational expert's ("VE") unreliable testimony regarding an estimate of the number of jobs available to Sok. The court held oral argument with the parties on April 8, 2021, after which the court requested supplemental briefing addressing any relevant recently-issued cases. Having fully considered the parties' arguments, the court concludes that the VE testimony was reliable and that the ALJ's decision is supported by substantial evidence.

BACKGROUND[1]

On August 22, 2016, plaintiff Kong Sok filed an application for a period of disability and disability insurance benefits. He also filed an application for supplemental security income on January 1, 2017. In these applications, Sok alleged a variety of mental and

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #11.

physical impairments caused in part by a serious car accident in which he was involved on September 6, 2015. In particular, Sok claimed disability due to head trauma, depression, anxiety, chronic headache, and back pain. (*See* AR at 141.) Despite his limitations, Sok's applications were denied initially and on reconsideration. He then requested a hearing before an ALJ, which was held on July 12, 2019.

Present at the hearing was Sok and his counsel, Patrick Scharmer, ALJ Akers, and VE Thomas A. Gusloff. As for VE Gusloff's credentials, he held a Master's degree in Rehabilitation Counseling, was President and Owner of Disability Service Providers, Inc., had over thirty years of relevant experience, and earned certificates related to rehabilitation counseling. (AR at 39, 436.) During the hearing, ALJ Akers posed a standard hypothetical question to VE Gusloff: listing specific limitations of a hypothetical individual and asking the VE whether jobs existed that the individual could perform. Gusloff answered in the affirmative, listing three representative occupations: "a job such as a cleaner, housekeeping. DOT code is 323.687-014. It is a light, an SVP 2, unskilled position. And nationally, 200,000. Cafeteria attendant, DOT code 311.677-010, light, SVP 2. Nationally, 100,000. Linen grader or sorter, DOT code 361.687-022, light, SVP 2. Nationally, 30,000." (AR at 63.)

On cross-examination, the VE was then asked the source of his data for the jobs and numbers upon which he testified. (AR at 68.) The VE essentially responded:

> [T]he job estimate[s] . . . are numbers that I derived from the U.S. Bureau of Labor Statistics. The Bureau of Labor Statistics will report job numbers in a grouping of . . . several specific occupations – [t]he separate DOT numbers. And my method would be to look at the composition of a group that I've selected where my title -- . . . [l]et's just use cafeteria attendant

> . . . is reported by the Bureau in an SOC standard occupational classification for dining room and cafeteria attendants and bartender helpers. There are four separate DOT occupations in that group. The Bureau has estimated, nationally, 450,000 jobs in that area. . . . And so there's 450,000 plus a few, in that grouping. Based on my knowledge of the labor market, when I look at the grouping, there's cafeteria attendants, dining room attendants, bartender helpers, and counter supply workers. My knowledge of the labor market over 30 years of job placement would indicate to me, that these jobs are readily available across the nation in . . . healthy numbers. . . . I estimated 100,000 for cafeteria attendants to reflect from that grouping.

(*Id.* at 69.)

Counsel for the claimant next asked whether "the linen grader position has about 782 DOT codes in it," which the VE confirmed. (AR at 69-70.) Continuing, counsel asked, "so did you do a similar analysis to narrow it down from the larger number of jobs in those 782 [codes] to the 30,000 jobs for the one DOT [code] that you estimated?", to which the VE responded:

> Yes, and it -- it's also based on, you know, knowledge that laundry, laundry and related work where this job is found crosses many specific industries. When you look at the specific grouping of inspectors, testers, sorters, samplers, weighers. There are many that are very specific and very limited in where they would be found. Those would certainly reflect much less of the -- of the jobs of the total composite grouping of -- of occupations. I'm sorry, I -- I gave an estimate of 30,000 for the linen grader.

(AR at 70.)

When asked again about the method used for arriving at these numbers, the VE answered:

> Well, the -- it's -- it's sort of loose statistics. It's based on knowledge of the labor market. I don't pick jobs that are so

3

> narrow that they can only be found in one -- one particular, limited occupational grouping area. I try to find jobs that are well reflected in the national economy. And it's based on knowledge of the labor market that's been derived over the past 30 plus years of job placement, vocational counseling, rehabilitation counseling . . . . So I mean, there's loose -- there's loose statistics involved. It's just -- it's based on knowledge of the labor market, how you might weigh the different jobs against each other . . .

(AR at 70-71.) Based on this answer, the attorney then objected to the VE's testimony, which the ALJ noted. (AR at 71.)

Following the hearing, the ALJ issued a written opinion explaining her decision to deny Sok's applications. In following the five step sequential process, she concluded that: (1) Sok had not engaged in substantial gainful activity since his alleged onset date; (2) he suffered from a variety of severe impairments; (3) none of those impairments met or equaled a listing-level impairment; (4) Sok had the residual functional capacity ("RFC") to perform a reduced range of light work; and (5) while Sok was unable to perform any past relevant work, there existed jobs in significant numbers in the national economy that he could perform. (AR at 16-23.) In arriving at this conclusion, the ALJ relied on the VE's hearing testimony that Sok would be able to perform the requirements of cleaner/housekeeping, cafeteria attendant, and linen grader, for which 200,000, 100,000, and 30,000 jobs existed in the national economy, respectively. (AR at 23.)

The ALJ also addressed the objection of claimant's counsel to these job numbers, explaining:

> The claimant's representative objected to these job numbers on the ground that the vocational expert's methodology for determining numbers of jobs is not reliable. The undersigned overrules this objection. The vocational expert has

4

>   professional knowledge and experience in job placement and, pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles (DOT). To the extent the testimony of the vocational expert addressed limitations that were not contemplated by the DOT, he clarified that his testimony on these topics was based on his substantial experience in job placement and does not conflict with testimony contained in the DOT. Moreover, the job numbers he provided are supported by his knowledge of the labor markets, over thirty years of job placement and the jobs he cited are readily available in the national economy.

(AR at 24.) Because the ALJ concluded that Sok was capable of making a successful adjustment to other available work based on the VE's testimony, she entered a finding of not disabled and denied Sok's applications. (AR at 24.)

OPINION

In reviewing a final decision by the Commissioner of Social Security, findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). "Evidence is considered substantial if a reasonable person would accept it as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Rather, a federal court reviews an administrative disability determination with deference, and it will uphold a denial of benefits unless the ALJ's decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *see Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Still, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence, *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992), and a decision cannot stand if it lacks evidentiary support, *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In addition, the ALJ must explain her "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.*; *see Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994). When the administrative law judge denies benefits, she must also build a logical and accurate bridge from the evidence to her conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

On appeal, plaintiff argues that the VE did not provide a sufficient foundation and rationale for his job estimate numbers, and that the ALJ erred by relying on this opinion testimony. The substantial evidence standard requires an ALJ to ensure that the VE's job-number estimates are the product of a reliable method. *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citing *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002)). Thus, "[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). More specifically, where a claimant challenges a VE's job estimate number, the ALJ "'must require the VE to offer a reasoned and principled explanation' of the method he used to produce it." *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020) (quoting *Chavez*, 895 F.3d at 970).

Even so, the Seventh Circuit has recognized that a VE's job estimate number is necessarily an approximation and acknowledged that there is "no way to avoid uncertainty" in arriving at such a figure. *Chavez*, 895 F.3d at 968. The Supreme Court has explained

6

that a reviewing court's inquiry into the reliability of VE testimony "is case-by-case" and should "take[] into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

One of the methods commonly employed by VEs in arriving at job estimate numbers is the so-called "equal distribution method," which this court has described in the following way:

> the expert uses the job titles and job requirements listed in the Dictionary of Occupational Titles (DOT). But because the DOT does not include job-number estimates, the expert seeks that information from an outside source. Unfortunately, it appears that the only reliable statistics are census data for broad categories of jobs, rather than for the job titles used in the DOT. So to estimate the number of positions available for an individual job listed in the DOT, the vocational expert simply divides the total number of jobs in a broad category by the number of job titles that fall within that category.

*Courtney v. Berryhill*, 385 F. Supp. 3d 761, 764 (W.D. Wis. 2018) (internal footnote and citations omitted). The Seventh Circuit has previously questioned the reliability of this method, out of a concern that it "rests on an assumption about the relative distribution of jobs within a broader grouping that lacks any empirical footing." *Chavez*, 895 F.3d at 966-69. While there is no *per se* bar against the use of the equal distribution method, should a plaintiff objects to a VE's job estimate numbers, the VE is expected to "offer an informed view on the reasonableness of his estimates." *Id.* at 969. For example, the VE could support an estimate based on the equal distribution method by "drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs." *Id.*

Here, when asked about the source of his job estimate numbers, VE Gusloff

7

explained that he began his analysis with the job numbers reported in the Bureau of Labor Statistics by groupings of specific Dictionary of Occupational Titles ("DOT") and Standard Occupational Classification ("SOC") occupations. As an example, Gusloff noted that the Bureau reported approximately 450,000 jobs for "dining room and cafeteria attendants and bartender helpers," then explained that since there were four DOT jobs in that Bureau grouping, he "estimated 100,000 for cafeteria attendants . . . from that grouping." (AR at 69.) Thus, the VE's testimony suggests that he relied upon the "equal distribution method" as a baseline or starting point, but then picked jobs that could not be found in a limited occupational grouping, and instead tried to find jobs that were "well reflected in the national economy." (AR at 70-71.) Additionally, in arriving at his final estimate of the number of available jobs, Gusloff explained that he drew on his "knowledge of the labor market that's been derived over the past 30 plus years of job placement, vocational counseling, rehabilitation." (AR at 69-71.)

Considering all the "features of the vocational expert's testimony," *Biestek*, 139 S. Ct. at 1157, as well as the straightforward job classifications that VE Gusloff ultimately relied upon, the court not only concludes that his job estimate numbers seem reliable, but more importantly, that the ALJ did not act unreasonably in relying on them. In particular, the VE referenced sources commonly used in social security matters -- namely, the Bureau of Labor Statistics Occupational Employment Survey, the DOT, and the SOC, all of which are government publications. He then employed the equal distribution method as a baseline, but did not do so mechanically, as he specifically selected jobs that were found across occupational groupings and were otherwise well-represented in the national

8

economy. He further drew on his many years of experience and generally strong credentials to support his estimates. In light of these factors, the ALJ's decision to overrule plaintiff's objection to the VE's testimony is supported by substantial evidence.

Indeed, VE Gusloff's method would appear to directly satisfy the standard contemplated in *Chavez*, which explained that a VE could support an estimate calculated by the equal distribution method by further "drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs." *Id.*; *compare Kenealy v. Saul*, No. 19-CV-40-JDP, 2019 WL 6463840, at *6 (W.D. Wis. Dec. 2, 2019) ("In the hearing, the . . . began by cross-referencing the Dictionary job titles with job numbers compiled by the Department of Labor and Bureau of Labor Statistics. But these job numbers only give total jobs for Dictionary categories, not for individual job titles within those categories. So she considered job-number data from JobBrowser Pro . . . . She then adjusted these numbers based on her experience as a vocational rehabilitation counselor in talking to employers and in placing workers into these positions. This is precisely the type of support that Chavez describes as sufficient, and the ALJ was justified in relying on the expert's job-number estimates."); *Carteaux v. Saul*, No. 1:18-CV-141-HAB, 2019 WL 4688185, at *5 (N.D. Ind. Sept. 26, 2019) (finding that the VE testimony "mirror[ed] the suggested testimony in *Chavez*" where VE enumerated the statistical sources which he used and "repeatedly noted that his opinions were based upon his twenty years of experience 'actually observing these jobs being performed and actually placing individuals into these positions'"); *Hildebrand v. Saul*, No. 2:17-CV-108-JPK, 2021 WL 1085605, at *8 (N.D.

9

Ind. Mar. 22, 2021); (VE explanation that "he relied on his past experience testifying and in job placement to relate the numbers obtained from the foregoing sources to DOT job titles" was "sufficiently supported to constitute substantial evidence relied upon by an ALJ"); *LaPierre-Poff v. Saul*, No. 20-C-819, 2021 WL 1171692, at *5 (E.D. Wis. Mar. 29, 2021) (VE testimony was reliable where she "explained that she relied upon data from customary sources, such as the Dictionary of Occupational Titles, U.S. Publishing, the U.S. Department of Labor, and Labor Market Information Bureau, and her 20 years of experience in placing people in the cited occupations" and there was no need for her to provide a "mathematical formula" to support her estimates); *with Courtney v. Berryhill*, 385 F. Supp. 3d 761, 764 (W.D. Wis. 2018) (remanding where VE used the equal distribution method as a starting point and offered only a vague explanation that he excluded "antiquated" jobs and "adjust[ed] the percentage distribution in order to ensure greater accuracy") (alteration in original); *and Maples v. Saul*, No. 1:20-CV-157-PPS, 2021 WL 1291766, at *6 (N.D. Ind. Apr. 7, 2021) (VE job estimate numbers unreliable where VE discussed "vague weighted percentages" and stated "that she does not know how to explain how the software [that she used to generate estimates] achieves job number").

Nevertheless, as noted above, plaintiff suggests that this case is more akin to that considered by the Seventh Circuit in *Brace*, which found that an ALJ erred in failing to ensure the reliability of a VE's testimony. However, in *Brace*, the Seventh Circuit specifically criticized the VE's use of "incant[ed] unelaborated words and phrases such as 'weighting' and 'allocation' and 'my information that I have,'" an explanation which the court found to be "unintelligible." 970 F.3d at 822. In so holding, the Seventh Circuit

contrasted the VE's vague and undefined "weighting" method with the equal distribution method, which although "flawed" still "has a defined meaning." *Id.* at 822-23. Here, unlike in *Brace*, the VE's explanation was both intelligible and based on a defined method. Certainly, the VE's could have been clearer in explaining his methodology, and his answers to plaintiff's questions were somewhat stumbling and not always easy to follow. However, there is no requirement that a VE's explanation of his method be eloquent, only that the ALJ "a logical and accurate bridge from the evidence to her conclusion." *Zurawski*, 245 F.3d at 887. In this case, the ALJ expressly followed the VE's discussion of his methodology, as well as found it to be reasoned and principled. Absent some basis to fault her explanation, the court has no basis to second guess her reliance on the VE's opinions.

At the same time, the court acknowledges that the line between "reliable" and "unreliable" testimony regarding job numbers that are by their nature "estimates" is hazy. *See Chavez*, 895 F.3d at 968 (acknowledging that there is "no way to avoid uncertainty" in arriving at job number estimates). For the reasons discussed above, however, the court finds VE Gusloff's testimony regarding the number of jobs available to Sok "qualif[ies] as 'more than a mere scintilla' of evidence supporting the ALJ's conclusion." *Biestek*, 139 S. Ct. at 1156. Accordingly, the Commissioner's decision will be affirmed.

ORDER

IT IS ORDERED that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, denying plaintiff Kong Sok's application for social security disability benefits is AFFIRMED. The clerk's office is directed to enter judgment in defendant's favor and close this case.

Entered this 24th day of September, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge